IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:25cr79-MHT |
| | ) | (WO) |
| JAMAL GARROTT | ) | |

OPINION AND ORDER ON SECOND MOTION TO SUPRESS

Defendant Jamal Garrott faces an indictment on two
counts of possession of a firearm by a convicted felon
in violation of 18 U.S.C. § 922(g)(1). He filed two
motions to suppress evidence found during, and as a
result of, two different automobile searches--one motion
for each count of the indictment. This case is before
the court on the recommendation of the United States
Magistrate Judge that Garrott's second motion to suppress
be denied. Also before the court are Garrott's
objections to the recommendation. Upon an independent
and de novo review of the record, the court agrees with
the recommendation that the second motion to suppress
should be denied, and finds that the objections should
be overruled. However, because the court's analysis and

findings differ in some ways from that set forth in the recommendation, and so that it can address certain issues raised in the objections, the court adopts the recommendation as to the result only and provides its own opinion.

## I.

On April 22, 2025, at around 12:30 a.m., Officer Cameron English of the Wetumpka Police Department saw a red Dodge Magnum going southbound on U.S. Highway 231 in Wetumpka, Alabama, with an expired registration tag sticker. It was dark outside, and the unlit highway was curving through a wooded, rural area, had two lanes in each direction, and had little to no shoulder. After confirming that the car's registration had been expired since 2022, English put on his lights and siren before passing an access road that, if turned on, would have led within one minute to a closed tire store set back from the highway with a lighted parking lot, but the driver

did not turn onto the road.  Instead, the driver continued driving for 1.17 miles at 40-45 miles per hour, well below the posted speed limit of 55 miles per hour, before stopping.

During the approximately one minute and 30-45 seconds that elapsed before the driver stopped, the officer used different siren tones to signal that the driver should pull over.  The driver passed by a lighted intersection in a curving, tree-lined part of the highway.  Coming out of the curve, the driver entered an open area with some businesses on either side of the road and drove about 20 seconds more before turning into an extremely well-lit, large, multi-pump gas station and convenience store on the right side of the highway.  He stopped between two of the pumps.

Officer English pulled in behind the driver, and another officer, Corporal J. Wood, pulled to the left and front of the driver.  English exited his police car, pointed his weapon at Garrott, began shouting at him to

3

put his hands up and to stay in his car.[1]  Wood exited
his police car, pointed a gun at the driver, who was
Garrott, and gave him a contrary order to get out of his
car.

Garrott initially put his hands up, then rolled down
the window, but got out of the car with his arms down and
began loudly objecting to having guns pointed at him.  He
then told the officers he wanted to get his phone from
the car and began to reach into the car to do so.  The
officers shouted at him to stop and put his hands up.
Garrott complied but continued shouting about the
officers' treatment of him.  He then dropped his arms and
gestured as he spoke.  Wood ordered him to walk toward
English, get on his knees, and put his hands behind his
back.  Garrott complied but continued to shout that that
they had no reason to point their guns at him.  Both

---

1.  The events at the gas station were recorded on
the officers' videos.  The court has reviewed these
videos in detail and relies on them for its findings.

4

officers explained that they did so because he was required to stop immediately when first signaled to stop. He argued that he did not need to stop immediately because it was dark and unsafe where they tried to stop him.

When he went down to his knees, Garrott continued to argue. As he was arguing, a small object fell out of his mouth and hit the ground. Garrott immediately picked it up, and within a second or two, put it back into his mouth before putting his hands behind his back.

While English was putting Garrott in the back of his car, Wood looked through the front windshield at the area above steering wheel, where he had seen Garrott put something. The car's headliner was torn, creating a storage space, and a used-looking clear plastic baggie with a whitish tinge was visible in that area. Wood then went back to Garrott and ordered him to open his mouth wide, but saw no loose object in his mouth.

After Garrott had been placed in the back of a police car, Wood told English that he had seen Garrott shove

something into the headliner and showed him where to
look.  After looking through the windshield at objects
in the liner, English opened the car door, removed the
baggie, and saw that it contained a white residue or
powder.[2]  The officers then proceeded to search the entire
car and found a loaded nine-millimeter pistol and a scale
with narcotics residue on it.  Garrott was transported
to the Elmore County Jail, and his car was towed for
storage.

## II.

### A.

Garrott moved to suppress all tangible and
testimonial evidence obtained as a result of the search
of the car, arguing that the officers lacked probable
cause to search the car as required by the 'automobile

_____

2. The powder later field tested positive for
methamphetamine.

exception' to the Fourth Amendment's warrant requirement. "The automobile exception [to the Fourth Amendment's warrant requirement] allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsay*, 482 F.3d 1285, 1293 (11th Cir. 2007).

Here, because it is undisputed that the car was mobile, the sole question is whether there was probable cause for the search. "Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). "[P]robable cause is a flexible, common-sense standard. ... A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 460 U.S. 730, 742 (1983)

(quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)). ‼

In evaluating whether probable cause exists, officers do not need "to rule out a suspect's innocent explanation for suspicious facts. ... [T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *D.C. v. Wesby*, 583 U.S. 48, 61 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). Thus, the court must decide "whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.'" *Id.*

Here, the government also relies on furtive conduct to support probable cause. Furtive conduct may be taken into account when determining whether probable cause exists. *See Sibron v. New York*, 392 U.S. 40, 66 (1968). However, such conduct alone is not sufficient, for

8

someone may be acting furtively merely to keep from the public eye what is personal and private but still legal. The touchstone of probable cause is the "fair probability that contraband or evidence *of a crime* will be found." *Goddard*, 312 F.3d at 1363 (emphasis added) (quotation marks and citation omitted).   Indeed, the Fourth Amendment includes within its protection private legal items.   Therefore, if the police are relying on furtive conduct, the conduct must be "coupled" with a reasonable belief that a crime is afoot or evidence of a crime will be found.   *Sibron*, 392 U.S. at 66-67.

Applying these precepts, the court will evaluate the events preceding the search from the perspective of a reasonable officer.


**B.**

In support of the existence of probable cause, the government first points to Garrott's failure to stop for over a mile after Office English signaled him to pull

over.  Garrott argues that a reasonable officer could not conclude that there was probable cause to search his car based on his delay in pulling over given the surrounding circumstances and the applicable law.  He contends that he did not pull over immediately because he felt it would have been dangerous to do so, and he wanted to find a well-lit, safe stopping place where other people were present.  He further argues that his delay in pulling over was authorized under the Alabama statute establishing the offense of attempting to elude a law enforcement officer, which states, "It is not a violation of this section for an individual to continue traveling at or below the speed limit, with or without the vehicle's flashers turned on, with the intent of stopping the vehicle at the nearest safe place."  Ala. Code § 13A-10-52(e).

Garrott's explanation for why he did not pull over immediately is plausible given the darkness of the road, the time of night, and the lack of shoulders and the

curve in the tree-lined road, which could have made pulling over hazardous, and other attending circumstances. Moreover, his conduct in not pulling over was apparently legal. But these factors are not determinative. The key question is "the degree of suspicion" a reasonable officer would have attributed to Garrott's conduct. *Wesby*, 583 U.S. at 61.

To be sure, Garrott kept driving after being repeatedly signaled to pull over. However, it was dark and a little past midnight; Garrott kept driving for only a minute and a half; he drove five to 10 miles per hour under the speed limit; and he *immediately* pulled over when he reached a well-lit, multi-pump gas station and convenience store with the indoor lights still on. If anything, he was reasonably cautious in waiting to reach the extremely well-lit, possibly open gas station for his own protection, should the police car and those in it not be what and whom they purported to be, and so the officers

11

could clearly see his movements.[3]  Garrott's conduct was
not suspicious under these circumstances.   Indeed,
Garrott's conduct reflected the reasonable caution that
any driver would have displayed for his own safety under
the circumstances presented.   Moreover, once Garrott
pulled into the well-lit station, any suspicion about his
conduct up to that point was dispelled.

And, even if Garrott's conduct could be viewed as
furtive, there was nothing whatsoever in it to reflect
that he had or was engaged in criminal conduct up to that
point.

## C.

Nevertheless, despite the fact that Garrott had acted
only cautiously and reasonably when he pulled into the
well-lit station immediately upon reaching it, both

_____

3. Indeed, stopping there was safer for both Garrott
and the officers, due to very bright lighting.

12

officers immediately pulled their guns on him.  The court finds no basis in the record for this severe mistreatment of someone.

To be sure, Garrott responded loudly, argued with the officers about whether their actions were justified, and repeatedly tried to convince them he had done nothing wrong.  Garrott had the right to object to what the officers were doing, and a person's decision to contest actions by law enforcement, standing alone, is not a strong indicator that the individual has done anything illegal.  Moreover, any person would be upset--and indeed frightened--were police officers to point guns and shout at them without cause after a traffic stop.  That Garrott was extremely loud and irate was a reaction generated by the officers.  Garrott's conduct in response to the officers was not suspicious or in any way indicative that criminal conduct was afoot.

13

D.

However, the events that followed lead the court to conclude that English and Wood had probable cause to search Garrott's car.  First, Wood saw Garrott put something in his car's headliner around the time he stopped the car.  On inspection, Wood saw that the headliner was torn, creating a storage space, and contained a used-looking clear plastic baggie with a whitish tinge.  Because people do not ordinarily store things inside of the torn liner of a car's inside roof, based on the timing of these acts, and because clear plastic baggies are frequently used to package drugs, a reasonable officer could have suspected that Garrott might have hidden contraband.

Wood also saw Garrott place something in his mouth around the time he stopped the car.  He then saw an object fall out of Garrott's mouth, which could have contributed to a reasonable officer's suspicion that contraband might be in his car.  Garrott argues that what fell out of his

14

mouth was a removable dental cover, also known as a
"grill," and therefore the sight of it could not have
contributed to probable cause.  Based on the court's
review of Corporal Wood's body cam video, it is
impossible to say what the object was, but it appears
Garrott's claim may be accurate.  On the video, one cannot
tell what the object is, but by repeatedly playing and
stopping the video and enlarging the images, it is
possible to see that the object reflected bright white
light back to the viewer at times and was oblong in shape.
The sound it made when it hit the ground indicated that
it was something hard and lightweight, made either of
metal or a hard plastic.  When one views the video with
the background knowledge that the object may be a grill,
it does appear plausible that Garrott slipped the object
onto his teeth.  One cannot see any visible sign that he
swallowed anything.

However, unlike the court, the officers on the scene
had only seconds to see the object and did not have the

opportunity to review the bodycam video carefully on a full-sized monitor to determine what fell out of Garrott's mouth. Instead, they were in the midst of an argument with Garrott when the object fell. They likely were able to perceive only that something small that appeared white had fallen out of Garrott's mouth and hit the floor, and that, although the item had just fallen on the dirty concrete parking area in front of a gas pump, Garrott quickly took the item off the floor and put it back into his mouth. A reasonable officer seeing this happen could have suspected that the object that fell out of Garrott's mouth could be an illegal substance, such as crack, given the officer's prior knowledge that Garrott had put something in his mouth as he was stopping the car.

The combination of these suspicions was sufficient to create probable cause to search the car. As noted earlier, people do not ordinarily store anything in the torn headliner of their cars, let alone used plastic

baggies, and it is common knowledge that baggies are commonly used as packaging for illegal substances. The presence of the used baggie in this unexpected storage place, combined with Garrott's placement of something in the headliner and his mouth as he stopped the car, and his quickly sticking the fallen object back into his mouth, created a fair probability that a search of the car could reveal illegal drugs. In sum, considering the totality of the circumstances, a reasonable officer could have had probable cause to believe that a search of the car would reveal the presence of contraband. As a result, the motion to suppress must be denied.

\*\*\*

17

Accordingly, it is ORDERED as follows:

(1) The objections (Doc. 68) are overruled.

(2) The recommendation of the United States Magistrate Judge (Doc. 65) is adopted as to the result.

(3) The motion to suppress (Doc. 51) is denied.

DONE, this the 3rd day of November, 2025.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE